**BURSOR & FISHER, P.A.**
L. Timothy Fisher (State Bar No. 191626)
Joshua R. Wilner (State Bar No. 353949)
1990 North California Blvd., 9th Floor
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile:  (925) 407-2700
E-mail: ltfisher@bursor.com
        jwilner@bursor.com

*Attorneys for Plaintiff*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| H.F., individually and on behalf of all others similarly situated, | Case No. |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| v. | JURY TRIAL DEMANDED |
| AMPLIFY LIFE INSURANCE COMPANY, | |
| Defendant. | |

Plaintiff H.F. ("Plaintiff") brings this class action complaint on behalf of herself, and all other persons similarly situated against Defendant Amplify Life Insurance Company ("Amplify" or "Defendant").  Plaintiff brings this action based on personal knowledge of the facts pertaining to herself, and on information and belief as to all other matters, by and through the investigation of undersigned counsel.

## NATURE OF THE ACTION

1.      Plaintiff brings this suit on behalf of all consumers in the United States who have accessed and completed an application for a life insurance policy on getamplifylife.com (the "Website").  The Website is owned and operated by Defendant.

2.      Defendant operates a digital platform on which consumers can complete a questionnaire to receive quotes on life insurance policies.  In order to receive an accurate quote, consumers must share sensitive, personal information, including their immigration status, drug and alcohol use, medical history, and other confidential medical information.  When consumers disclose such sensitive information to access services, data privacy is paramount to maintaining consumer trust.  Indeed, consumers would not disclose such information if they suspected that it was not being safeguarded.

3.      Unfortunately, and unbeknownst to Plaintiff and members of the putative class, Defendant discloses and assists several third parties, including LinkedIn Corporation ("LinkedIn"); Meta Platforms, Inc. ("Meta"); TikTok Inc. ("TikTok"); Google LLC ("Google"); HubSpot, Inc. ("HubSpot"); and Hotjar Ltd. ("Hotjar") (collectively, the "Third Parties") to intentionally intercept Website users' sensitive and confidential communications.  The Third Parties then match the information they receive from Defendant to the specific Third Party profile of the consumer who provided the information, thereby de-anonymizing the Website user. These interceptions happen immediately as the information is entered into the Website.

4.      Neither Defendant nor Third Parties received consent for these interceptions and have therefore engaged in conduct that expressly contravened their own terms and representations.

5.      Notably, Amplify consumers are not presented with any terms for their quote or policy at all until after they have answered over a dozen highly personal questions as part of the

application process. As such, it is impossible for them to give consent to the disclosure of their information.

6.      Defendant disclosed and assisted Third Parties in intentionally intercepting confidential information from Defendant's Website for targeted advertising purposes.  Plaintiff brings this action for legal and equitable remedies resulting from these illegal acts.

**PARTIES**

7.      Plaintiff H.F. is domiciled in Kersey, Pennsylvania.  Plaintiff maintained a LinkedIn account and Facebook account at all relevant times before and after completing a health survey on Amplify's Website.

8.      In or around August 2024, Plaintiff completed a survey to receive a life insurance quote on the Amplify Website.  Plaintiff used a browser that she also uses to access her LinkedIn and Facebook account.  When completing the survey on the Website, Plaintiff disclosed sensitive information, including confidential medical information, to determine her eligibility for Amplify's life insurance matching services, as described more thoroughly herein.  Plaintiff was required to provide sensitive, private information about her medical history, substance use, and engagement in risky behaviors.  Unbeknownst to Plaintiff, the Third Parties were each tracking her private activity on Amplify's Website using the Pixels described herein.  The Third Parties used this software to track Plaintiff and intercept her communications with Amplify, including communications that contained confidential information related to her finances, citizenship and marital statuses, personal and family health histories including HIV status, substance use, and criminal history. The Third Parties never received consent from Plaintiff or received permission to track or sell her data to advertisers.  Defendant's acts and practices, as described herein, are an egregious breach of Plaintiff's privacy because they aided and allowed with the Third Parties' interceptions.

9.      Defendant Amplify Life Insurance Company is a Delaware corporation with its principal place of business in San Francisco, California.  Defendant Amplify, at all times, knew that the incorporation of the Pixels to the Amplify Website would result in the interception of confidential medical, financial, and personal information.  Defendant Amplify, as the operator of its website, knew that its users interactions on the Website were being intercepted.  Defendant

Amplify is well aware of the dangers of incorporating such technology on its website, which collects such sensitive information, but continues to do so due to the value of the data that is intercepted.

## JURISDICTION AND VENUE

10.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2)(A) because this case is a class action where the aggregate claims of all members of the proposed class are in excess of $5,000,000, exclusive of interest and costs, and at least one member of the proposed class is a citizen of a state different from at least one Defendant.

11.     This Court has personal jurisdiction over Defendant because Defendant collected the private information of thousands or millions of people in California, sold that information to advertisers in California—who targeted advertisements to Californians based in part on their location in California—and profited from the sale of Californians' personal information. Further, Defendant's principal place of business is in this district.

12.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial part of the events giving rise to the claim occurred in this District.

## FACTUAL ALLEGATIONS

13.     Amplify is a life insurance company that provides consumers with life insurance policies and similar financial products. Upon entering the Website, Amplify warrants that "Amplify is where everyone comes to Build Wealth with Life Insurance."[1]

14.     Amplify purports to provide its customers with "life insurance policies that allow you to access funds while you are alive."[2] Prospective customers are led to Amplify's product recommendation questionnaire through multiple links on its homepage encouraging visitors to "Get An Estimate," "Get a Quote," "Simplify with Amplify," and "Get Started." *See, e.g.*, Figure 1.

---

[1] AMPLIFY, https://www.getamplifylife.com/
[2] *Id.*

**Figure 1:**



15.     On the product recommendation questionnaire, consumers must provide Amplify with certain information to determine their eligibility for Amplify products including, but not limited to, their name, age range, financial goals, family members, current height and weight, substance use, personal and familial medical histories including HIV status, and criminal history.

16.     Unbeknownst to consumers, multiple third-party companies were tracking their activity from the moment they entered the Amplify Website and intercept each of these communications in real time.

## I.     OVERVIEW OF THE THIRD PARTY PIXELS

### A.     The LinkedIn Insight Tag

17.     LinkedIn markets itself as "the world's largest professional network on the internet[.]"[3]   But LinkedIn is no longer simply a tool to help users find jobs or expand their

---

[3] LINKEDIN, WHAT IS LINKEDIN AND HOW CAN I USE IT?, https://www.linkedin.com/help/linkedin/answer/a548441#.

professional network.  LinkedIn has moved into the marketing and advertising space and boasts of its ability to allow potential advertisers to "[r]each 1 billion+ professionals around the world" via its Marketing Solutions services.[4]  Recently, LinkedIn was projected as being responsible for "roughly 0.9 percent of the global ad revenue" which included approximately $5.91 billion in advertising revenue in 2022.[5]

18.    According to LinkedIn, "[t]argeting is a foundational element of running a successful advertising campaign — [g]etting your targeting right leads to higher engagement, and ultimately, higher conversion rates."[6]  Targeting refers to ensuring that advertisements are tailored to, and appear in front of, the intended demographic for an advertisement.  To that end, LinkedIn's Marketing Solutions services allow potential advertisers to "[b]uild strategic campaigns" targeting specific users.[7]  LinkedIn's "marketing solutions allow advertisers to select specific characteristics to help them reach their ideal audience.  The ads [users] see on LinkedIn are then targeted to provide content relevant to [the users]."[8]

19.    As a result of its activities and operation of the LinkedIn Insight Tag, LinkedIn is able to make extremely personal inferences about individuals' demographics, intent, behavior, engagement, interests, buying decisions, and more.[9]

---

[4] LINKEDIN, MARKETING SOLUTIONS, https://business.linkedin.com/marketing-solutions.

[5] Valentina Dencheva, *LinkedIn annual ad revenue 2017-2027*, STATISTA (Dec. 12, 2023), https://www.statista.com/statistics/275933/linkedins-advertising-revenue.

[6] LINKEDIN, REACH YOUR AUDIENCE: TARGETING ON LINKEDIN, p.3, https://business.linkedin.com/content/dam/me/business/en-us/marketing-solutions/resources/pdfs/linkedin-targeting-playbook-v3.pdf.

[7] LINKEDIN, *supra* note 5.

[8] LINKEDIN, LINKEDIN ADS AND MARKETING SOLUTIONS, https://www.linkedin.com/help/lms/answer/a421454.

[9] *See* LINKEDIN, MARKETING SOLUTIONS, https://business.linkedin.com/marketing-solutions/audience ("Target audiences through demographic marketing[,]" "Zero in on intent, behavior, engagement, interests, and more[,]" and "Reach the LinkedIn audience involved in the buying decision").

---

20.    The personal information and communications obtained by LinkedIn are used to fuel various services offered via LinkedIn's Marketing Solutions including Ad Targeting, Matched Audiences, Audience Expansion, and LinkedIn Audience Network.[10]

21.    Such information is extremely valuable to marketers and advertisers because the inferences derived from users' personal information and communications allow marketers and advertisers, including healthcare providers and insurance companies, to target potential customers.[11]

22.    For example, through the use of LinkedIn's Audience Network, marketers and advertisers are able to expand their reach and advertise on sites other than LinkedIn to "reach millions of professionals across multiple touchpoints."[12]  According to Broc Munro of Microsoft, which owns LinkedIn, "[w]e gravitate towards social platforms like LinkedIn to achieve more targeted marketing engagement. However, we know that our audiences don't spend all their time on social media. LinkedIn Audience Network enables us to expand our reach to trusted sites while still respecting our audience targeting. This increases the impact of our advertising."[13]

---

[10] *See id.*

[11] LINKEDIN, PRIVACY POLICY, https://www.linkedin.com/legal/privacy-policy ("We serve you tailored ads both on and off our Services. We offer you choices regarding personalized ads, but you cannot opt-out of seeing other ads."); LINKEDIN, ACCOUNT TARGETING, https://business.linkedin.com/marketing-solutions/ad-targeting ("Target your ideal customer based on traits like their job title, company name or industry, and by professional or personal interests"); LINKEDIN, EXAMPLES OF TRENDING AND BEST-IN-CLASS HEALTHCARE CAMPAIGNS AND CONTENT, p.6, https://business.linkedin.com/content/dam/me/business/en-us/marketing-solutions/healthcare-microsite/resources/lkin-lms-sales-healthcare-campaigns-trending-content-Jan2023.pdf ("BD zeroed in on the end-benefit with a 30 second video introducing their PIVO needle-free blood collection device to potential customers."); LINKEDIN, HEALTHCARE SOCIAL MEDIA STRATEGIES FOR 2023, p.1, https://business.linkedin.com/content/dam/me/business/en-us/marketing-solutions/healthcare-microsite/resources/hc-social-media-trends.pdf (listing "potential customers" as "Common audiences" for insurance sector).

[12] LINKEDIN, ACCOUNT TARGETING, https://business.linkedin.com/marketing-solutions/ad-targeting.

[13] LINKEDIN, LINKEDIN AUDIENCE NETWORK, https://business.linkedin.com/marketing-solutions/native-advertising/linkedin-audience-network.

23.     In July 2022, "LinkedIn Marketing Solutions surpassed $5 billion in annual revenue[.]"[14]  That figure is "expected to further grow to reach 10.35 billion U.S. dollars by 2027."[15]

24.     According to LinkedIn, the LinkedIn Insight Tag is "[a] simple code snippet added to [a] website [that] can help you optimize your campaigns, retarget your website visitors, and learn more about your audiences."[16]  LinkedIn represents that the LinkedIn Insight Tag "enable[s] in-depth campaign reporting and unlock[s] valuable insights about your website visitors."[17]

25.     LinkedIn's current iteration of its Insight Tag is a JavaScript-based code which allows for the installation of its software.[18]  A critical feature allows the LinkedIn Insight Tag to track users, even when third-party cookies are blocked.[19]   LinkedIn "recommend[s] using the JavaScript-based Insight Tag or Conversions API" because third-party cookie settings are being deprecated across the industry.[20]  Embedding the JavaScript as a first-party cookie causes users' browsers to treat the LinkedIn Insight Tag as though it is offered by the website being visited, rather than by third-party LinkedIn.  Doing so ensures that the third-party cookie-blocking functions of modern web browsers do not prevent LinkedIn from collecting data through its software.[21]  Instead, the LinkedIn Insight Tag is shielded with the same privacy exemptions offered to first-party cookies.

---

[14] *LinkedIn Business Highlights from Microsoft's FY22 Q4 Earnings*, LINKEDIN PRESSROOM (July 25, 2022), https://news.linkedin.com/2022/july/linkedin-business-highlights-from-microsoft-s-fy22-q4earnings#:~:text=And%20LinkedIn%20Marketing%20Solutions%20surpassed,revenue%20for%20the%20first%20time.

[15] Dencheva, *supra* note 7.

[16] LINKEDIN, INSIGHT TAG, https://business.linkedin.com/marketing-solutions/insight-tag.

[17] LINKEDIN, LINKEDIN INSIGHT TAG FAQS, https://www.linkedin.com/help/lms/answer/a427660.

[18] LINKEDIN, *supra* note 17.

[19] *Id.* ("It's important for advertisers to prepare for these changes by switching to JavaScript tags and enabling 'enhanced conversion tracking' in the Insight Tag settings to continue capturing signals where 3rd party cookies are blocked.").

[20] *See id.*

[21] *See id.*

---

26.     When a user who has signed in to LinkedIn (even if the user has subsequently logged out) is browsing a website where the LinkedIn Insight Tag has been embedded, an HTTP request is sent using cookies, which includes information about the user's actions on the website.

27.     These cookies also include data that differentiates users from one another and can be used to link the data collected to the user's LinkedIn profile.

28.     The HTTP request about an individual who has previously signed into LinkedIn includes requests from the "li_sugr" and "lms_ads" cookies.  Each of these cookies are used by LinkedIn "to identify LinkedIn Members off LinkedIn" for advertising purposes.[22]

29.     For example, the "li_sugr" cookie is "[u]sed to make a probabilistic match of a user's identity."[23]  Similarly, the "lms_ads" cookie is "[u]sed to identify LinkedIn Members off LinkedIn for advertising."[24]

30.     A LinkedIn profile contains information including an individual's first and last name, place of work, contact information, and other personal details.  Based on information it obtains through the LinkedIn Insight Tag, LinkedIn is able to target its account holders for advertising.

31.     LinkedIn never receives consent from users to intercept and collect electronic communications containing their sensitive and unlawfully disclosed information.  In fact, LinkedIn expressly warrants the opposite.

32.     When first signing up, a user agrees to the User Agreement.[25]  By using or continuing to use LinkedIn's Services, users agree to two additional agreements: the Privacy

---

[22] LINKEDIN, LINKEDIN COOKIE TABLE, https://www.linkedin.com/legal/l/cookie-table.

[23] *See id.*

[24] *See id.*

[25] LINKEDIN, USER AGREEMENT, https://www.linkedin.com/legal/user-agreement.

Policy[26] and the Cookie Policy.[27]  For California residents, LinkedIn also publishes a California Privacy Disclosure.[28]

33.     LinkedIn's Privacy Policy begins by stating that "LinkedIn's mission is to connect the world's professionals . . . . Central to this mission is our commitment to be transparent about the data we collect about you, how it is used and with whom it is shared."[29]

34.     The Privacy Policy goes on to describe what data LinkedIn collects from various sources, including cookies and similar technologies.[30]  LinkedIn states "we use cookies and similar technologies (e.g., pixels and ad tags) to collect data (e.g., device IDs) to recognize you and your device(s) on, off and across different services and devices where you have engaged with our Services. We also allow some others to use cookies as described in our Cookie Policy."[31]

35.     However, LinkedIn offers an express representation: "**We will only collect and process personal data about you where we have lawful bases.**"[32]

36.     Despite this explicit representation, LinkedIn intentionally intercepts and receives sensitive information in violation of state and federal privacy laws due to the value of the data.

37.     Users never choose to provide sensitive information to LinkedIn because, among other reasons, they never know whether a particular website uses the LinkedIn Insight Tag, and, if so, what sensitive personal data it collects.

38.     The LinkedIn Insight Tag was embedded on the Website, which allowed LinkedIn to intercept and record "click" events.  Click events detail information about which page on the Website the consumer was viewing as well as the selections they were making on this page.

---

[26] LINKEDIN, PRIVACY POLICY, https://www.linkedin.com/legal/privacy-policy.

[27] LINKEDIN, COOKIE POLICY, https://www.linkedin.com/legal/cookie-policy.

[28] LINKEDIN, CALIFORNIA PRIVACY DISCLOSURE, https://www.linkedin.com/legal/california-privacy-disclosure.

[29] LINKEDIN, PRIVACY POLICY, https://www.linkedin.com/legal/privacy-policy.

[30] *Id.*

[31] *Id.*

[32] *Id.* (emphasis added).

39.     These interceptions also included the li_sugr and lms_ads cookies, which LinkedIn utilizes to identify its account holders for targeted advertising.

40.     LinkedIn incorporated the information it intercepted from the Amplify Website into its marketing tools to fuel its targeted advertising service.

41.     The requested information is protected by state and federal law, and consumers would not disclose such information if they knew it was being unlawfully intercepted by a third party.  Plaintiff never consented, agreed, authorized, or otherwise permitted LinkedIn to intercept her confidential personal and health information.

42.     When the LinkedIn Insight Tag is used on a website, it is not like a tape recorder or a "tool" used by one party to record the other.  Instead, the LinkedIn Insight Tag involves LinkedIn, a separate and distinct third-party entity from the parties in the conversation, using the LinkedIn Insight Tag to eavesdrop on, record, extract information from, and analyze a conversation to which it is not a party.  This is so because LinkedIn itself is collecting the content of any conversation.  That information is then analyzed by LinkedIn before being provided to any entity that was a party to the conversation (like Defendant)

43.     One of LinkedIn's partners is Amplify.  The LinkedIn Insights Tag is employed on the Website in the manner described throughout this Complaint

**B.     The Facebook Tracking Pixel**

44.     Facebook, owned by Meta, describes itself as a "real identity platform,"[33]  meaning users are allowed only one account and must share "the name they go by in everyday life."[34]  To that end, when creating an account, users must provide their first and last name, along with their birthday and gender.[35]

---

[33] Sam Schechner and Jeff Horwitz, *How Many Users Does Facebook Have? The Company Struggles to Figure It Out*, WALL. ST. J. (Oct. 21, 2021).

[34] FACEBOOK, COMMUNITY STANDARDS, PART IV INTEGRITY AND AUTHENTICITY, https://www.facebook.com/communitystandards/integrity_authenticity.

[35] FACEBOOK, SIGN UP, https://www.facebook.com.

45.     Meta sells advertising space by highlighting its ability to target users.[36]  Meta can target users so effectively because it surveils user activity both on and off its sites.[37]  This allows Meta to make inferences about users beyond what they explicitly disclose, like their "interests," "behavior," and "connections."[38]  Meta compiles this information into a generalized dataset called "Core Audiences," which allows advertisers to reach precise audiences based on specified targeting types.[39]

46.     Advertisers can also build "Custom Audiences."[40]  Custom Audiences enables advertisers to reach "people who have already shown interest in [their] business, whether they're loyal customers or people who have used [their] app or visited [their] website."[41]  With Custom Audiences, advertisers can target existing customers directly, and they can also build "Lookalike Audiences," which "leverage[] information such as demographics, interests, and behavior from your source audience to find new people who share similar qualities."[42]   Unlike Core Audiences, advertisers can build Custom Audiences and Lookalike Audiences only if they first supply Meta with the underlying data.  They can do so through two mechanisms: by manually uploading contact information for customers or by utilizing Meta's "Business Tools."[43]

47.     As Meta puts it, the Business Tools "help website owners and publishers, app developers, and business partners, including advertisers and others, integrate with [Facebook],

---

[36] FACEBOOK, WHY ADVERTISE ON FACEBOOK, INSTAGRAM AND OTHER META TECHNOLOGIES, https://www.facebook.com/business/help/205029060038706.

[37] FACEBOOK, ABOUT META PIXEL, https://www.facebook.com/business/help/742478679120153?id=120537668283214.

[38] FACEBOOK, AD TARGETING: HELP YOUR ADS FIND THE PEOPLE WHO WILL LOVE YOUR BUSINESS, https://www.facebook.com/business/ads/ad-targeting.

[39] https://www.facebook.com/business/news/Core-Audiences.

[40] FACEBOOK, ABOUT CUSTOM AUDIENCES, https://www.facebook.com/business/help/744354708981227?id=246909795337649.

[41] FACEBOOK, AD TARGETING, HELP YOUR ADS FIND THE PEOPLE WHO WILL LOVE YOUR BUSINESS, https://www.facebook.com/business/ads/ad-targeting.

[42] FACEBOOK, ABOUT LOOKALIKE AUDIENCES, https://www.facebook.com/business/help/164749007013531?id=401668390442328.

[43] FACEBOOK, CREATE A CUSTOMER LIST CUSTOM AUDIENCE, https://www.facebook.com/business/help/170456843145568?id=2469097953376494; FACEBOOK, CREATE A WEBSITE CUSTOM AUDIENCE, https://www.facebook.com/business/help/1474662202748341?id=2469097953376494.

---

understand and measure their products and services, and better reach and serve people who might be interested in their products and services."[44]  Put more succinctly, Meta's Business Tools are bits of code that advertisers can integrate into their websites, mobile applications, and servers, thereby enabling Meta to intercept and collect user activity on those platforms.

48.    The Business Tools are automatically configured to capture certain data, like when a user visits a webpage, that webpage's Universal Resource Locator ("URL") and metadata, or when a user downloads a mobile application or makes a purchase.[45]  Meta's Business Tools can also track other events.  Meta offers a menu of "standard events" from which advertisers can choose, including what content a visitor views or purchases.[46]  Advertisers can even create their own tracking parameters by building a "custom event."[47]

49.    One such Business Tool is the Facebook Pixel (the "Facebook Pixel").  Meta offers this piece of code to advertisers, like Defendant, to integrate into their websites.  The Facebook Pixel "tracks the people and type of actions they take."[48]  When a user accesses a website hosting the Facebook Pixel, Meta's software script surreptitiously directs the user's browser to contemporaneously send a separate message to Meta's servers.  This secret and contemporaneous transmission contains the original GET request sent to the host website, along with additional data that the Facebook Pixel is configured to collect.  This transmission is initiated by Meta code and concurrent with the communications with the host website.  At relevant times, two sets of code

---

[44] FACEBOOK, THE META BUSINESS TOOLS, https://www.facebook.com/help/331509497253087.

[45] *See* FACEBOOK, META FOR DEVELOPERS: META PIXEL, ADVANCED, https://developers.facebook.com/docs/meta-pixel/advanced/; *see also* FACEBOOK, BEST PRACTICES FOR META PIXEL SETUP, https://www.facebook.com/business/help/218844828315224?id=1205376682832142; FACEBOOK, META FOR DEVELOPERS: MARKETING API - APP EVENTS API, https://developers.facebook.com/docs/marketing-api/app-event-api/.

[46] FACEBOOK, SPECIFICATIONS FOR META PIXEL STANDARD EVENTS, https://www.facebook.com/business/help/402791146561655?id=1205376682832142.

[47] FACEBOOK, ABOUT STANDARD AND CUSTOM WEBSITE EVENTS, https://www.facebook.com/business/help/964258670337005?id=1205376682832142; *see also* FACEBOOK, META FOR DEVELOPERS: MARKETING API – APP EVENTS API, https://developers.facebook.com/docs/marketing-api/app-event-api/.

[48] FACEBOOK, RETARGETING, https://www.facebook.com/business/goals/retargeting.

---

were thus automatically run as part of the browser's attempt to load and read Defendant's Website—Defendant's own code and Facebook's embedded code.

50.     Each time Defendant sent this activity data, it also disclosed a consumer's personally identifiable information, including their Facebook ID ("FID"). An FID is a unique and persistent identifier that Facebook assigns to each user. With it, any ordinary person can look up the user's Facebook profile and name. Notably, while Meta can easily identify any individual on its Facebook platform with only their unique FID, so too can any ordinary person who comes into possession of an FID. Meta admits as much on its website. Indeed, ordinary persons who come into possession of the FID can connect to any Facebook profile.

51.     A user who accessed Defendant's Website while logged into Facebook transmitted what is known as a "c_user cookie" to Facebook, which contained that user's unencrypted Facebook ID.

52.     What is more, when a user checks out on the Website, Meta is sent the email address used to check out. The email address is encrypted by way of a process known as SHA256, which is a way to "hash" written words in a series of random numbers.

53.     The Meta Pixel is designed to collect information about website visitors that can be matched to an individual's Facebook profile for the purpose of sending targeted advertising to that user. Though the "hashing" would prevent a party that is not Meta from obtaining the subscriber's email address, Meta, as the recipient of the data and the entity that creates the hash, can decrypt the hashed email addresses it receives and match it to the profile of Facebook users.

54.     When the Facebook Pixel is used on a website, it is not like a tape recorder or a "tool" used by one party to record the other. Instead, the Facebook Pixel involves Meta, a separate and distinct third-party entity from the parties in the conversation, using the Facebook Pixel to eavesdrop on, record, extract information from, and analyze a conversation to which it is not a party. This is so because Meta itself is collecting the content of any conversation. That information is then analyzed by Meta before being provided to any entity that was a party to the conversation (like Defendant).

55.     Once Meta intercepts website communications, it has the capability to use such information for its own purposes.  In 2021, Meta generated over $117 billion in revenue.[49]  With respect to the apps offered by Meta, substantially all of Meta's revenue is generated by selling advertising space.[50] Meta sells advertising space by highlighting its ability to target users by including them in the Core Audiences and Custom Audiences offered to its clients.[51]

56.     In practice, this means the information collected is used to (i) analyze trends in consumer behavior based on data collected from websites across the internet that Meta can then use when providing targeted advertising to other companies, (ii) create consumer profiles of specific users, allowing Meta to sell future customers targeted advertising to consumers with specific profile characteristics, and (iii) develop new Meta Business Tools products and services, or improve pre-existing Meta Business Tools products and services.

57.     One of Meta's partners is Amplify.  The Facebook Pixel is employed on the Website in the manner described throughout this Complaint.

## C.    The TikTok Pixel

58.     TikTok offers a SaaS called "TikTok Pixel," which "helps businesses track the performance of their ads" by sending information from the business's website to TikTok, which then uses that information to optimize ad campaigns on TikTok and across the internet.[52]

59.     The TikTok pixel can be "plugged in" to any website, as the pixel is a piece of code that can be added to any website to capture "events" (any activity by a user that happens on a website).

60.     The TikTok Pixel is part of a package of prebuilt software tools under the "TikTok for Business" product line that allow the delivery of personalized ads.  By employing TikTok to

---

[49] FACEBOOK, META ANNUAL REPORT 2021, https://s21.q4cdn.com/399680738/files/doc_financials/annual_reports/2023/2021-Annual-Report.pdf at 51.

[50] *Id.* at 63.

[51] FACEBOOK, WHY ADVERTISE ON FACEBOOK, INSTAGRAM AND OTHER META TECHNOLOGIES, https://www.facebook.com/business/help/205029060038706.

[52] "TikTok Pixel 101: What It Is & How to Use It," https://popupsmart.com/blog/tiktok-pixel

---

collect user information through the TikTok Pixel, websites that procure TikTok's services can use the information to deliver more effective targeted advertisements, increasing revenue for the websites.

61.    In short, when users interact with a webpage with the TikTok Pixel installed, the TikTok Pixel collects the "Metadata and button clicks" (information about what the user clicked on—such as the specific URL address visited by the user— or text entered into the webpage), a timestamp for the event, and the visitor's IP address.[53] That information is sent automatically to TikTok.

62.    The "TikTok for Business" business model involves entering into voluntary partnerships with various companies and surveilling communications on their partners' websites with the TikTok Pixel.

63.    Thus, through websites that employ TikTok's services, TikTok directly receives the electronic communications of website visitors entered into search bars, chat boxes, and online questionnaires in real time.

64.    On each page of the questionnaire on Defendant's Website (where the TikTok Pixel is installed), TikTok collects the URL value of the page visited (which contains the relevant part of the question), an identification code TikTok uses to track the user, and the visitor's browser type and operating system.

65.    When the TikTok Pixel is used on a website, it is not like a tape recorder or a "tool" used by one party to record the other.  Instead, the TikTok Pixel involves TikTok, a separate and distinct third-party entity from the parties in the conversation, using the TikTok Pixel to eavesdrop on, record, extract information from, and analyze a conversation to which it is not a party.  This is so because TikTok itself is collecting the content of any conversation.  That information is then analyzed by TikTok before being provided to any entity that was a party to the conversation (like Defendant).

---

[53] "About TikTok Pixel," https://ads.tiktok.com/help/article/tiktok-pixel?redirected=2

66.     Once TikTok intercepts website communications, it has the capability to use such information for its own purposes. TikTok's Commercial Terms of Service grant TikTok "a non-exclusive, royalty-free, worldwide, transferable, sublicensable license to access, use, host, cache, store, display, publish, distribute, modify and adapt [information collected from partner websites] in order to develop, research, provide, promote, and improve TikTok's products and services."[54]

67.     In practice, this means the information collected is used to (i) analyze trends in consumer behavior based on data collected from websites across the internet that TikTok can then use when providing targeted advertising to other companies, (ii) create consumer profiles of specific users, allowing TikTok to sell future customers targeted advertising to consumers with specific profile characteristics, and (iii) develop new TikTok Business products and services, or improve pre-existing TikTok Business products and services.

68.     One of TikTok's partners is Amplify. The TikTok Pixel is employed on the Website in the manner described throughout this Complaint.

**D.     The Google Analytics Pixel**

69.     Google offers a range of advertising SaaS, one of which is called "Google Analytics."

70.     "Google Analytics is a platform that collects data from [] websites and apps to create reports that provide insights" for businesses.[55] This is made possible by the Google Analytics Pixel, a piece of code installed on a website that collects information on how website users interact with a business's website, such as "how many users bought an item … by tracking whether they made it to the purchase-confirmation page."[56]

71.     Google advertises that this service can "[m]onitor activity on your site as it happens."[57]

---

[54] "TikTok For Business Commercial Terms Of Service" https://ads.tiktok.com/i18n/official/policy/commercial-terms-of-service

[55] "How Google Analytics Works" https://support.google.com/analytics/answer/12159447?hl=en&ref_topic=14089939&sjid=2827624563183915220-NC.

[56] *Id.*

[57] "The Finer Points" https://marketingplatform.google.com/about/analytics/features/.

72.     Google's business model involves entering into voluntary partnerships with various companies and surveilling communications on their partners' websites with the Google Analytics Pixel.

73.     Thus, through websites that employ Google's services, Google directly receives the electronic communications of website visitors entered into search bars, chat boxes, and online questionnaires in real time.

74.     On each page of the questionnaire on Defendant's Website (where the Google Analytics is installed), Google Analytics collects the visitor's individual response to the questionnaire, an identifier used to track the visitor's activity across websites, the language spoken on the site, and the visitor's browser, operating system, and Wi-Fi provider.

75.     When the Google Analytics Pixel is used on an entry to a website, it is not like a tape recorder or a "tool" used by one party to record the other.  Instead, the Google Analytics Pixel involves Google, a separate and distinct third-party entity from the parties in the conversation, using the Google Analytics Pixel to eavesdrop on, record, extract information from, and analyze a conversation to which it is not a party.  This is so because Google itself is collecting the content of any conversation.  That information is then analyzed by Google before being provided to any entity that was a party to the conversation (like Defendant).

76.     Once Google intercepts the Website communications, it has the capability to use such information for its own purposes. "Google uses the information shared by sites and apps to deliver [] services, maintain and improve them, develop new services, measure the effectiveness of advertising, protect against fraud and abuse, and personalize content and ads you see on Google and on [] partners' sites and apps."[58]

77.     Google's range of SaaS services is based on Google's ability to collect and analyze information about consumers' web behavior and deliver targeted advertising to select consumers based on their web habits.  This involves collecting visitor information from thousands of websites

---

[58] "Google Privacy and Terms," https://policies.google.com/technologies/partner-sites

and then analyzing that information in order to deliver targeted advertising and group web users so that they can be targeted for products and categories they are interested in.

78.     Information from websites, like Defendant's Website, is central to Google's ability to successfully market their advertising capabilities to future clients.

79.     In sum, Google has the capability to use website communications to (i) improve its own products and services; (ii) develop new Google for Business and Google Analytics products and services; and (iii) analyze website visitors' communications to assist with data analytics and targeted advertising.

80.     One of Google's partners is Amplify.  The Google Analytics Pixel is employed on the Website in the manner described throughout this Complaint.

**E.     HubSpot Forms**

81.     HubSpot Forms is a service that can be installed on a webpage to capture information entered into forms on a website and to "pass any information captured on your website or application to HubSpot, including custom data,"[59] so as to "turn anonymous website visitors in to qualified leads" for targeted marketing campaigns.[60]

82.     The information captured by HubSpot Forms is automatically processed by HubSpot and added to datasets that can be linked with targeted marketing and real-time bidding advertising campaigns, like Salesforce and Google Ads.[61]

83.     HubSpot collects this information to create profiles of consumers to add to demographic lists, which are groups of consumers that are categorized based on specific characteristics for the purpose of targeting them with hyper-specific advertising.  These audiences

---

[59] Forms Overview, HUBSPOT, https://legacydocs.hubspot.com/docs/methods/forms/forms_overview.

[60] Free Online Form Builder, HUBSPOT, https://www.hubspot.com/products/marketing/forms?hubs_content=knowledge.hubspot.com%2Fforms%2Fcreate-forms&hubs_content-cta=easily%2Fcreate%2Fforms.

[61] Associate Forms With Salesforce Campaigns, HUBSPOT, https://knowledge.hubspot.com/forms/how-do-i-associate-a-form-with-a-salesforce-campaign?hubs_content=knowledge.hubspot.com/marketing-tools/topics&hubs_content-cta=uiLinkDark.

can be plugged into the advertising platforms of Meta, Google, and other advertisers to assist in HubSpot's customers' marketing efforts.[62]

84.    When HubSpot Forms is used on an entry to a website, it is not like a tape recorder or a "tool" used by one party to record the other.  Instead, HubSpot Forms involves HubSpot, a separate and distinct third-party entity from the parties in the conversation, using HubSpot Forms to eavesdrop on, record, extract information from, and analyze a conversation to which it is not a party.  This is so because HubSpot itself is collecting the content of any conversation in real time and viewing each and every piece of information collected.  That information is then analyzed by HubSpot before being provided to any entity that was a party to the conversation (like Defendant).

85.    Once HubSpot intercepts the Website communications, it has the capability to use such information for its own purposes.  HubSpot's services are based on HubSpot's ability to collect and analyze consumer's web behavior and deliver that information to present and future customers (*i.e.*, to collect information from one customer's users and disclose that same information to other customers), who use that information for targeted advertising and product optimization.  HubSpot must constantly improve its ability to create custom audiences to compete with other data management and CRM platforms in the competitive targeted advertising and real-time bidding markets.  This optimization is done by collecting and analyzing information, like that collected from Plaintiff and Class Members.

86.    Information from websites such as Defendant's Website is central to HubSpot's ability to successfully market their advertising capabilities to future clients.

87.    In sum, HubSpot has the capability to use website communications to: (i) improve its own products and services; (ii) develop new products and services; and (iii) analyze website visitors' communications to assist with data analytics and targeted advertising.

---

[62] Create And Sync Ad Conversion Events With Your Google Ads Account, GOOGLE, https://mail.google.com/mail/u/0/#chat/dm/7C4WH4AAAAE?compose=CllgCHrdkvBLRwCvBcl TkzblPVvtjXgLCVnpFXbgLSPDgJhcvtRqfzNdhWfbftwbWqNnBsHkVNB.

88.     HubSpot views and processes every piece of information collected from HubSpot forms, including the information collected from the Website, and uses it to assist with data analytics and targeted advertising.

89.     One of HubSpot's partners is Amplify.  HubSpot Forms is employed on the Website in the manner described throughout this Complaint.

**F.    Hotjar Session Replay**

90.     Pursuant to agreements with Hotjar, Defendant voluntarily embedded the session replay wiretaps on its Website.  This allowed Hotjar to surreptitiously collect interactions between Amplify and its Website users.

91.     Defendant has embedded Hotjar's session replay wiretap on the Website.

92.     Session Replay creates a "video-like reproduction of the entire user journey" from the moment a user lands on the webpage.[63]

93.     Session Replay relies on recording every second of a user's interactions with a website, allowing Hotjar to "view exactly how your users interact with [a] website."[64]  This data is then analyzed and used to make a video that is an exact replica of each user interacting with the website.

94.     Technology like Hotjar's Session Replay feature is not only highly intrusive, but dangerous.  A 2017 study by Princeton University found that session recording technologies were collecting sensitive user information such as passwords and credit card numbers.  The research notes that this wasn't simply the result of a bug, but rather insecure practices.  Thus, session recording technologies such as Datadog's can leave users vulnerable to data leaks and the harm resulting therefrom.

95.     HotJar's business model involves entering into voluntary partnerships with various companies and surveilling communications on their partners' websites with session replay.

---

[63] Use Datadog Session Replay to view real-time user journeys, https://www.datadoghq.com/blog/session-replay-datadog/.

[64] *Id.*

96.     Thus, through websites that employ Hotjar's services, Hotjar directly receives the recording of each website visit, including electronic communications of website visitors entered into search bars, chat boxes, and online quizzes in real time.

97.     When Hotjar session replay is used on an entry to a website, it is not like a tape recorder or a "tool" used by one party to record the other.  Instead, it involves Hotjar, a separate and distinct third-party entity from the parties in the conversation, using the Session Replay to eavesdrop on, record, extract information from, and analyze a conversation to which it is not a party.  This is so because Hotjar itself is collecting the content of any conversation.  That information is then analyzed by Hotjar before being provided to any entity that was a party to the conversation (like Defendant).

98.     Hotjar's services are based on its ability to collect and analyze consumer's web behavior and deliver that data to present and future customers, who use that data for targeted advertising and product optimization.

99.     Information from websites, like Defendant's Website, is central to Hotjar's ability to successfully market their advertising capabilities to future clients.

100.    In sum, Hotjar has the capability to use website communications to (i) improve its own products and services; (ii) develop new products and services; and (iii) analyze website visitors' communications to assist with data analytics and targeted advertising.

101.    One of Hotjar's partners is Amplify.  Hotjar Session Replay is employed on the Website in the manner described throughout this Complaint.

102.    By law, Plaintiff is entitled to privacy in her protected personal and health information and confidential communications.  Amplify deprived Plaintiff of her privacy rights when it implemented a system that surreptitiously tracked, recorded, and transmitted Plaintiff's and other online consumers' confidential communications, personally identifiable information, and protected health information.

## II.    DEFENDANT INSTALLED THIRD PARTY PIXELS ON ITS QUESTIONNAIRE

103.    Defendant's questionnaire is part of the Website at issue in this action.

104.    The questionnaire is portrayed to Website visitors required for assessing qualifications for Amplify's life insurance coverage and associated financial products.

105.    Defendant employed the services of the Third Parties and their Pixels on each and every page of the questionnaire to track users' responses to the questions and send those responses to the Third Parties so the Third Parties could analyze the information and target users with advertising based on those answers.

106.    The images herein show the series of questions given to Website visitors when they navigate to the Website. Each of the Pixels are installed on each page of the questionnaire, collecting information from users who answer these questions.

107.    Defendant intercepted consumers' confidential information from its life insurance product questionnaire in order to monetize that data from targeted advertising. This interception is demonstrated below, using the LinkedIn Insight Tag as an example. *See, e.g.,* Figures 2-3.

**Figure 2:**



108.    Once a prospective customer enters their private information and clicks a response on the survey, the information from the respective question and response is transmitted to Amplify and simultaneously intercepted by the trackers installed on the page.  *See* Figure 3.

**Figure 3:**



109.    The questionnaire on the Amplify Website asks several questions related to private, confidential health information to provide insurance recommendations to consumers and to collect information to assess the risk of insuring them.  Through the trackers installed on the Website, Third Parties intercept all responses entered by consumers, as shown below.

110.    Amplify's questionnaire continues by asking consumers their gender, with two options provided. *See* Figure 4. This information is then transmitted to Third Parties through the trackers installed on the Website. *See* Figure 5.

1

**Figure 4**

2



1

**Figure 5:**

2

3



4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24    111.    Amplify's questionnaire then asks consumers whether they are a U.S. Citizen, with

25    two options provided. *See* Figure 6. This information is then transmitted to Third Parties through

26    the trackers installed on the Website. *See* Figure 7.

27

28

**Figure 6:**



**Figure 7:**

112.    Amplify's questionnaire then asks consumers whether they are currently employed, with two options provided. *See* Figure 8. This information is then transmitted to Third Parties through the trackers installed on the Website. *See* Figure 9.

**Figure 8:**



**Figure 9:**

```
https://px.ads.linkedin.com/wa/
Thu Oct 17 10:35:22 EDT 2024

Content:
{
    "pids": [4139036],
    "scriptVersion": 172,
    "time": 1729175722092,
    "domain": "quotes.getamplifylife.com",
    "url":
"https://quotes.getamplifylife.com/basic-questions?_gl=1*dhnjhz*_ga*MTI4MzkwODMyMi
4xNzI5MTc1NzM2*_ga_DX6DTG5SFS*MTcyOTE3NTYzNS4xLjAuMTcyOTE3NTYzNy41OC4wLjA.",
    "pageTitle": "Amplify Quotes",
    "websiteSignalRequestId": "5bc5858b-7db1-123d-aba8-d1e5f8d8bcdd",
    "isTranslated": false,
    "liFatId": "",
    "liGiant": "",
    "misc": {
        "psbState": -4
    },
    "isLinkedInApp": false,
    "hem": null,
    "signalType": "CLICK",
    "href": "",
    "domAttributes": {
        "elementSemanticType": null,
        "elementValue": null,
        "elementType": null,
        "tagName": "BUTTON",
        "backgroundImageSrc": null,
        "imageSrc": null,
        "imageAlt": null,
        "innerText": "Yes",
        "elementTitle": "employed",
        "cursor": "pointer"
    },
```

113.    Next, Amplify's questionnaire asks consumers their marital status. *See* Figure 10. This information is then transmitted to Third Parties through the trackers installed on the Website. *See* Figure 11.

**Figure 10:**



**Figure 11:**

114.    Amplify's questionnaire then asks consumers whether they plan to travel outside the U.S. in the next year. *See* Figure 12. This information is then transmitted to Third Parties through the trackers installed on the Website. *See* Figure 13.

**Figure 12:**



**Figure 13:**



115.    Amplify's questionnaire next asks consumers to identify whether they will be skydiving, hang gliding, mountain climbing, racing, or scuba diving in the next two years. *See* Figure 14. This information is then transmitted to Third Parties through the trackers installed on the Website. *See* Figure 15.

**Figure 14:**



**Figure 15:**

https://px.ads.linkedin.com/wa/
Thu Oct 17 10:35:39 EDT 2024

Content:

{
    "pids": [41390036],
    "scriptVersion": 172,
    "time": 1729175739223,
    "domain": "quotes.getamplifylife.com",
    "url":
"https://quotes.getamplifylife.com/health7_g1=1*dhnjhs*_ga*MTI4MzkwODMyMi4xNzI5MTc1NjM2*_ga_DX4ZTGS8F8*MTcyOTE3NTYzN8.4xLjAuMTcyOTE3NTYzNy4l0C4wLjA.",
    "pageTitle": "Amplify Quotes",
    "websiteSignalRequestId": "229dfe81-16b7-7c9a-3828-72a4a7ce9298",
    "isTranslated": false,
    "liFatId": "",
    "liGiant": "",
    "misc": {
        "psbState": -4
    },
    "isLinkedInApp": false,
    "hem": null,
    "signalType": "CLICK",
    "href": "",
    "domAttributes": {
        "elementSemanticType": null,
        "elementValue": null,
        "elementType": null,
        "tagName": "BUTTON",
        "backgroundImageSrc": null,
        "imageSrc": null,
        "imageAlt": null,
        "innerText": "",
        "elementTitle": null,
        "cursor": "pointer"
    },

116.    Amplify's questionnaire next asks consumers to provide their height and weight. *See* Figure 16. This information is then transmitted to Third Parties through the trackers installed on the Website. *See* Figure 17.

**Figure 16:**



**Figure 17:**



117.    Amplify's questionnaire next asks consumers to disclose whether they have used cigarettes, marijuana, or other substances in the previous five years. *See* Figure 18. This information is then transmitted to Third Parties through the trackers installed on the Website. *See* Figure 19.

**Figure 18:**



**Figure 19:**



118.    If the consumer indicates that they have used marijuana in the previous five years, for example, an additional page on the questionnaire asks the consumer to explain more about their experience with marijuana, including the type of product the consumer used, their frequency of use, and the approximate date they last used this substance. *See* Figure 20. This information is then transmitted to Third Parties through the trackers installed on the Website. *See* Figure 21.

**Figure 20:**



**Figure 21:**



119.    Amplify's questionnaire next requires consumers to disclose any diagnosis of a serious medical condition within the previous ten years. *See* Figure 22. This information is then transmitted to Third Parties through the trackers installed on the Website. *See* Figure 23.

**Figure 22:**



**Figure 23:**

https://px.ads.linkedin.com/wa/
Thu Oct 17 10:36:28 EDT 2024

Content:

{
    "pids": [4139036],
    "scriptVersion": 172,
    "time": 1729175788657,
    "domain": "quotes.getamplifylife.com",
    "url":
"https://quotes.getamplifylife.com/health?_gl=1*dhnjhz*_ga*MTI4MzkwODMyMi4xNzI5MTc
1NjM2*_ga_DX6DTG5SFS*MTcyOTE3NTYzNS4xLjAuMTcyOTE3NTYzNy41OC4wLjA.",
    "pageTitle": "Amplify Quotes",
    "websiteSignalRequestId": "d27852e3-d198-b0ca-7293-3e105105c09e",
    "isTranslated": false,
    "liFatId": "",
    "liGiant": "",
    "misc": {
        "psbState": -4
    },
    "isLinkedInApp": false,
    "hem": null,
    "signalType": "CLICK",
    "href": "",
    "domAttributes": {
        "elementSemanticType": null,
        "elementValue": null,
        "elementType": null,
        "tagName": "DIV",
        "backgroundImageSrc": null,
        "imageSrc": null,
        "imageAlt": null,
        "innerText": "High cholesterol",
        "elementTitle": "High cholesterol",
        "cursor": "pointer"
    },

120.    If, for example, a consumer indicates they have been diagnosed with high cholesterol over the previous ten years, they are then prompted to provide their latest cholesterol (HDL) ratio. *See* Figure 24. This information is then transmitted to Third Parties through the trackers installed on the Website. *See* Figure 25.

**Figure 24:**



**Figure 25:**

121.    Amplify's questionnaire next requires consumers to disclose the serious medical diagnoses of their biological parents and siblings. *See* Figure 26. This information is then transmitted to Third Parties through the trackers installed on the Website. *See* Figure 27.

**Figure 26:**



**Figure 27:**



122.   The consumer concludes the questionnaire by providing their name and contact information and verifying their identity.

## III.   DEFENDANT AIDED, AGREED WITH, EMPLOYED, PROCURED, OR OTHERWISE ENABLED THE THIRD PARTIES' WIRETAPPING OF PLAINTIFF'S ELECTRONIC COMMUNICATIONS FOR MARKETING, ADVERTISING, AND ANALYTICS PURPOSES

### A.   Defendant Disclosed Users' Information to LinkedIn for Marketing, Advertising, and Analytics Purposes

123.   As described above, the LinkedIn Insight Tag collects information from visitors' interactions with Defendant's Website.

124.   The purpose of this invasion of privacy is straightforward: LinkedIn collects information from Defendant's website and sends back an analysis of that information, identifying website traffic and ad performance and targeting ads for specific individuals.

125.   This is valuable to Defendant because it improves the effectiveness of Defendant's advertisements, allows for the targeting of users, and provides performance information for ad campaigns.

126.   In addition to helping companies like Defendant make better use of their own customer information, LinkedIn aggregates that information with the information collected from all sites containing the LinkedIn Insight Tag to track users across multiple websites and platforms, which increases the value of LinkedIn's advertising services when they are offered to other companies.

127.   Thus, the agreement for Defendant to aid in LinkedIn's wiretapping of Plaintiff and Class Members' personal responses to the questionnaire is done for the purpose of improperly increasing the advertising efficiency and, by extension, the profits, of both parties.

### B.   Defendant Disclosed Users' Information to Meta for Marketing, Advertising, and Analytics Purposes

128.   As described above, the Facebook Pixel collects information from visitors' interactions with Defendant's Website.

129.    The purpose of this invasion of privacy is straightforward: Meta collects information from Defendant's website and sends back an analysis of that information, identifying website traffic and ad performance and targeting ads for specific individuals.

130.    This is valuable to Defendant because it improves the effectiveness of Defendant's advertisements, allows for the targeting of users, and provides performance information for ad campaigns.

131.    In addition to helping companies like Defendant make better use of their own customer information, Meta aggregates that information with the information collected from all sites containing the Facebook Pixel to track users across multiple websites and platforms, which increases the value of Meta's advertising services when they are offered to other companies.

132.    Thus, the agreement for Defendant to aid in Meta's wiretapping of Plaintiff and Class Members' personal responses to the questionnaire is done for the purpose of improperly increasing the advertising efficiency and, by extension, the profits, of both parties.

### C.    Defendant Disclosed Users' Information to TikTok for Marketing, Advertising, and Analytics Purposes

133.    As described above, the TikTok Pixel collects information from visitors' interactions with Defendant's Website.

134.    The purpose of this invasion of privacy is straightforward: TikTok collects information from Defendant's website and sends back an analysis of that information, identifying website traffic and ad performance and targeting ads for specific individuals.

135.    This is valuable to Defendant because it improves the effectiveness of Defendant's advertisements, allows for the targeting of users, and provides performance information for ad campaigns.

136.    In addition to helping companies like Defendant's make better use of their own customer information, TikTok aggregates that information with the information collected from all sites containing the TikTok Pixel to track users across multiple websites and platforms, which increases the value of TikTok's advertising services when they are offered to other companies.

137.    Thus, the agreement for Defendant to aid in TikTok's wiretapping of Plaintiff and Class Members' personal responses to the questionnaire is done for the purpose of improperly increasing the advertising efficiency and, by extension, the profits, of both parties.

**D.    Defendant Disclosed Users' Information to Google Analytics for Marketing, Advertising, and Analytics Purposes**

138.    As described above, the Google Analytics Pixel collects information from visitors' interactions with Defendant's Website.

139.    The purpose of this invasion of privacy is straightforward: Google collects information from Defendant's website and sends back an analysis of that information, identifying website traffic and ad performance and targeting ads for specific individuals.

140.    This is valuable to Defendant because it improves the effectiveness of Defendant's advertisements, allows for the targeting of users, and provides performance information for ad campaigns.

141.    In addition to helping companies like Defendant make better use of their own customer information, Google aggregates that information with the information collected from all sites containing the Google Analytics Pixel to track users across multiple websites and platforms, which increases the value of Google's advertising services when they are offered to other companies.

142.    Thus, the agreement for Defendant to aid in Google's wiretapping of Plaintiff and Class Members' personal responses to the questionnaire is done for the purpose of improperly increasing the advertising efficiency and, by extension, the profits, of both parties.

**E.    Defendant Disclosed Users' Information to HubSpot for Marketing, Advertising, and Analytics Purposes**

143.    As described above, HubSpot Forms collects information from visitors' interactions with Defendant's Website.

144.    The purpose of this invasion of privacy is straightforward: HubSpot collects information from Defendant's website and sends back an analysis of that information, identifying website traffic and ad performance and targeting ads for specific individuals.

145.    This is valuable to Defendant because it improves the effectiveness of Defendant's advertisements, allows for the targeting of users, and provides performance information for ad campaigns.

146.    In addition to helping companies like Defendant make better use of their own customer information, HubSpot aggregates that information with the information collected from all sites containing HubSpot Forms to track users across multiple websites and platforms, which increases the value of Google's advertising services when they are offered to other companies.

147.    Thus, the agreement for Defendant to aid in HubSpot's wiretapping of Plaintiff and Class Members' personal responses to the questionnaire is done for the purpose of improperly increasing the advertising efficiency and, by extension, the profits, of both parties.

### F.    Defendant Disclosed Users' Information to Hotjar for Marketing, Advertising, and Analytics Purposes

148.    As described above, Hotjar collects information from visitors' interactions with Defendant's Website.

149.    The purpose of this invasion of privacy is straightforward: Hotjar collects information from Defendant's website and sends back an analysis of that information, identifying website traffic and performance data and providing session information used for targeting ads for specific individuals.

150.    This is valuable to Defendant because it improves the effectiveness of Defendant's advertisements, allows for the targeting of users, and provides performance information for ad campaigns.

151.    In addition to helping companies like Defendant make better use of their own customer information, Hotjar aggregates that information with the information collected from all sites containing Hotjar Session Replay to track users across multiple websites and platforms, which increases the value of Hotjar's services when they are offered to other companies.

152.    Thus, the agreement for Defendant to aid in Hotjar's wiretapping of Plaintiff and Class Members' personal responses to the questionnaire is done for the purpose of improperly increasing the website and advertising efficiency and, by extension, profits of both parties.

**CLASS ACTION ALLEGATIONS**

153.    Plaintiff brings this action on behalf of all consumers in the United States who have accessed and completed an application for a life insurance policy on the Website in the following Classes (collectively, the "Classes"):

*Nationwide Class.*  All natural persons in the United States who completed any part of the application for a life insurance policy on the Website during the determined Class Period whose protected personal and medical information was disclosed through the Website to Third Parties.

*Pennsylvania Subclass.*  All natural persons in the Commonwealth of Pennsylvania who completed any part of the application for a life insurance policy on the Website during the determined Class Period whose protected personal and medical information was disclosed through the Website to Third Parties.

154.    Excluded from the Class is Defendant, the officers and directors of the Defendant at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns and any entity in which either Defendant have or had a controlling interest.

155.    Plaintiff is a member of the Class she seeks to represent.

156.    Members of the putative Class are so numerous that their individual joinder herein is impracticable.  Based on information and Plaintiff's belief, members of the putative Class number in the thousands.  The precise number of putative Class members and their identities are unknown to Plaintiff at this time but may be determined through discovery.  Putative Class members may be notified of the pendency of this action by mail and/or publication through the distribution of Defendant's records.

157.    Common questions of law and fact exist as to all putative Class members and predominate over questions affecting only individual Class members.  Common legal and factual questions include, but are not limited to:

a.    Whether Amplify's conduct violates the California Invasion of Privacy Act, Cal. Penal Code § 630, *et seq*.;

b.    Whether Third Parties learned the contents of Plaintiff's and Class members' communications with Amplify;

c.  Whether Third Parties used the information it learned from the contents of Plaintiff's and Class members' communications with Amplify; and

d.  Whether Third Parties intentionally used an electronic amplifying or recording device to eavesdrop or record Plaintiff's and Class members' confidential communications with Amplify without the Plaintiff's and Class members' consent.

158.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendant's wrongful conduct.  Plaintiff has no interests antagonistic to the interests of the other members of the Class.  Plaintiff and all members of the Class have sustained economic injury arising out of Defendant's violations of statutory law as alleged herein.

159.    Plaintiff is an adequate representative of the Class because her interests do not conflict with the interests of the putative Class members she seeks to represent, she has retained counsel competent and experienced in prosecuting class actions, and she intends to prosecute this action vigorously.  The interests of the Class will be fairly and adequately protected by Plaintiff and her counsel.

160.    The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of Plaintiff and the putative members of the Class.  Each individual Class member may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendant's liability.  Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case.  Individualized litigation also presents potential for inconsistent or contradictory judgments.  In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendant's liability.  Class treatment of the liability issues will ensure that all claims are consistently adjudicated.

161.     California law applies to the entirety of the Class.  California's substantive laws apply to every member of the Class, regardless of where in the United States the Class member resides.  Defendant's own Terms & Conditions explicitly state that "This agreement and your use of the Website shall be governed by the laws of the state of California, without regard to principles of conflict of laws."[65]   By choosing California law for the resolution of disputes covered by its User Agreement, Defendant concedes that it is appropriate for this Court to apply California law to the instant dispute to all Class members.  Further, California's substantive laws may be constitutionally applied to the claims of Plaintiff and the Class members under the Due Process Clause, *see* U.S. Const. amend. XIV, § 1, and the Full Faith and Credit Clause.  *See* U.S. Const. art. IV, § 1, of the U.S. Constitution.  California has significant contact, or significant aggregation of contacts, the claims asserted by the Plaintiff and all Class members thereby creating state interests that ensure that the choice of California state law is not arbitrary or unfair.  Defendant's decision to reside in California and avail itself of California's laws, and to engage in the challenged conduct from and emanating out of California, renders the application of California law to the claims herein constitutionally permissible.  The application of California laws to the Class is also appropriate under California's choice of law rules because California has significant contacts to the claims of Plaintiff and the proposed Class and California has the greatest interest in applying its laws here.

162.     Plaintiff reserves the right to revise the foregoing class allegations and definitions based on facts learned and legal developments following additional investigation, discovery, or otherwise.

## <u>COUNT I</u>
### Violation of the California Invasion of Privacy Act, Cal. Penal Code § 631

163.     Plaintiff repeats the allegations contained in the paragraphs above as if fully set forth herein and brings this count individually and on behalf of the members of the Class against Defendant.

---

[65] AMPLIFY, TERMS & CONDITIONS, https://www.getamplifylife.com/terms-and-conditions.

164.    The California Invasion of Privacy Act (the "CIPA") is codified at California Penal Code Sections 630 to 638.  The CIPA begins with its statement of purpose—namely, that the purpose of the CIPA is to "protect the right of privacy of the people of [California]" from the threat posed by "advances in science and technology [that] have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications . . ."  Cal. Penal Code § 630.

165.    A person violates California Penal Code Section 631(a), if:

> by means of any machine, instrument, or contrivance, or in any other manner, [s/he] intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively, or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system, or [s/he] willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state; or [s/he] uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained . . .[66]

166.    To avoid liability under section 631(a), a defendant must show it had the consent of all parties to a communication.

167.    At all relevant times, Third Parties tracked and intercepted Plaintiff's and Class members' internet communications while using www.getamplifylife.com to determine their eligibility for Amplify's life insurance products.  These communications were intercepted without the authorization and consent of Plaintiff and Class members.

168.    Through these interceptions, Third Parties intended to learn some meaning of the content the visitors requested.

169.    The following items constitute "machine[s], instrument[s], or contrivance[s]" under the CIPA, and even if they do not, the LinkedIn Insight Tag fall under the broad catch-all category of "any other manner":

a.      The computer codes and programs used to track Plaintiff and Class members'

---

[66] Cal. Penal Code § 631(a).

communications while they were navigating www.getamplifylife.com;

b.    Plaintiff's and Class members' browsers;

c.    Plaintiff's and Class members' computing and mobile devices;

d.    Third Parties' web and ad servers;

e.    The web and ad servers from which Third Parties tracked and intercepted Plaintiff's and Class members' communications while they were using a web browser to access or navigate www.getamplifylife.com;

f.    The computer codes and programs used by Third Parties to effectuate their tracking and interception of Plaintiff's and Class members' communications while they were using a browser to visit www.getamplifylife.com; and

g.    The plan Third Parties carried out to effectuate its tracking and interception of Plaintiff's and Class members' communications while they were using a web browser or mobile device to visit www.getamplifylife.com.

170.    At all relevant times, Third Parties, though their associated tracking technologies, intentionally tapped or made unauthorized connections with the lines of internet communications between Plaintiff and Class members and the Amplify Website without the consent of all parties to the communication.

171.    Third Parties, willfully and without the consent of Plaintiff and Class members, read or attempted to read, or learn the contents or meaning of Plaintiff's and Class members' communications to Amplify while the communications were in transit or passing over any wire, line or able, or were being received at any place within California when it intercepted Plaintiff's and Class members' communications and data with Amplify.

172.    Third Parties used or attempted to use the communications and information they received through their tracking technology, including to supply advertising services.

173.    The confidential information intercepted through the Third Parties' tracking technologies, including but not limited to pre-existing health conditions, constituted protected health information.

174.    As a result of the above violations, Defendant is liable to Plaintiff and other Class members in the amount of $5,000 dollars per violation or three times the amount of actual damages, whichever is greater.  Additionally, California Penal Code Section 637.2 specifically states that "[it] is not a necessary prerequisite to an action pursuant to this section that the plaintiff has suffered, or be threatened with, actual damages."

175.    Under the CIPA, Defendant is also liable for reasonable attorney's fees, and other litigation costs, injunctive and declaratory relief, and punitive damages in an amount to be determined by a jury, but sufficient to prevent the same or similar conduct by Defendant in the future.

## COUNT II
### Violation of the California Invasion of Privacy Act,
### Cal. Penal Code § 632

176.     Plaintiff repeats the allegations contained in the paragraphs above as if fully set forth herein and brings this count individually and on behalf of the members of the Class against Defendant.

177.    Cal. Penal Code § 632 prohibits "intentionally and without the consent of all parties to a confidential communication," the "use[] [of] an electronic amplifying or recording device to eavesdrop upon or record the confidential communication."

178.    Section 632 defines "confidential communication" as "any communication carried on in circumstances as may reasonably indicate that any party to the communication desires it to be confined to the parties thereto[.]"

179.    Plaintiff's and Class members' communications to Amplify, including their sensitive personal and health information, such as information related to pre-existing health conditions, were confidential communications for purposes of § 632, because Plaintiff and Class members had an objectively reasonable expectation of privacy in this data.

180.    Plaintiff and Class members expected their communications to Amplify to be confined to Amplify in part, due to the protected nature of the health information at issue.  Plaintiff

and Class members did not expect third parties to secretly eavesdrop upon or record this confidential information and their communications.

181. Third Party tracking technologies are all electronic amplifying or recording devices for purposes of § 632.

182. By contemporaneously intercepting and recording Plaintiff's and Class members' confidential communications to Amplify through this technology, third parties eavesdropped and/or recorded confidential communications through an electronic amplifying or recording device in violation of § 632 of CIPA.

183. At no time did Plaintiff or Class members consent to Third Parties' conduct, nor could they reasonably expect that their communications to Amplify would be overheard or recorded by Third Parties.

184. The Third Parties utilized Plaintiff's and Class members' sensitive personal and health information for their own purposes, including for targeted advertising.

185. Plaintiff and Class members seek statutory damages in accordance with § 637.2(a) which provides for the greater of: (1) $5,000 per violation; or (2) three times the amount of damages sustained by Plaintiff and the Class in an amount to be proven at trial, as well as injunctive or other equitable relief.

186. Plaintiff and Class members have also suffered irreparable injury from these unauthorized acts. Plaintiff's and Class members' sensitive data has been collected, viewed, accessed, stored, by Third Parties, have not been destroyed, and due to the continuing threat of such injury, have no adequate remedy at law. Plaintiff and Class members are accordingly entitled to injunctive relief.

## COUNT III
### Invasion of Privacy Under California's Constitution/Intrusion Upon Seclusion

187. Plaintiff repeats the allegations contained in the paragraphs above as if fully set forth herein and brings this count individually and on behalf of the members of the Class against Defendant.

188.    Plaintiff and Class members have an interest in: (1) precluding the dissemination and/or misuse of their sensitive, confidential communications and protected health information; and (2) making personal decisions and/or conducting personal activities without observation, intrusion, or interference, including, but not limited to, the right to visit and interact with various internet sites without being subjected to wiretaps without Plaintiff's and Class members' knowledge or consent.

189.    At all relevant times, by using the Third Party tracking technologies to record and communicate consumers' personal identifiers alongside their sensitive personal information and confidential medical communications, Defendant intentionally invaded Plaintiff's and Class members' privacy rights under the California Constitution and intruded on Plaintiff's and Class member's seclusion.

190.    Plaintiff and Class members had a reasonable expectation that their communications, identities, health information, citizenship status and other data would remain confidential, and that Defendant would not intercept such information communicated on www.getamplifylife.com.

191.    Plaintiff and Class members did not authorize Defendant to record and transmit Plaintiff's and Class members' private medical communications alongside their personally identifiable and health information.

192.    This invasion of privacy was serious in nature, scope, and impact because it related to consumers' private medical communications.  Moreover, it constituted an egregious breach of the societal norms underlying the privacy right.

193.    Accordingly, Plaintiff and Class members seek all relief available for invasion of privacy under the California Constitution and the common law.

### COUNT IV
**Violation of the Electronic Communications Privacy Act**
**18 U.S.C. § 2511(1), *et seq.***

194.    Plaintiff incorporates by reference the allegations contained in the paragraphs above as if fully set forth herein. Plaintiff repeats the allegations contained in the paragraphs above as if

1    fully set forth herein and brings this count individually and on behalf of the members of the Class

2    against Defendant.

3        195.    The Electronic Communications Privacy Act ("ECPA") prohibits the intentional

4    interception of the content of any electronic communication.  18 U.S.C. § 2511.

5        196.    The ECPA protects both sending and receiving communications.

6        197.    18 U.S.C. § 2520(a) provides a private right of action to any person whose wire or

7    electronic communications are intercepted, disclosed, or intentionally used in violation of Chapter

8    119.

9        198.    The transmission of Plaintiff's personally identifying information ("PII") and

10   personal health information ("PHI") to Defendant's Website qualify as a "communication" under

11   the ECPA's definition of 18 U.S.C. § 2510(12).

12       199.    The transmission of PII and PHI between Plaintiff and Class members and

13   Defendant's Website with which they chose to exchange communications are "transfer[s] of signs,

14   signals, writing,…data, [and] intelligence of [some] nature transmitted in whole or in part by a

15   wire, radio, electromagnetic, photoelectronic, or photooptical system that affects interstate

16   commerce" and are therefore "electronic communications" within the meaning of 18 U.S.C. §

17   2510(12).

18       200.    The ECPA defines "contents," when used with respect to electronic

19   communications, to "include[] any information concerning the substance, purport, or meaning of

20   that communication."  18 U.S.C. 18 U.S.C. § 2510(8).

21       201.    The ECPA defines an interception as the "acquisition of the contents of any wire,

22   electronic, or oral communication through the use of any electronic, mechanical, or other device."

23   18 U.S.C. § 2510(4).

24       202.    The ECPA defines "electronic, mechanical, or other device," as "any

25   device…which can be used to intercept a[n]…electronic communication[.]"  18 U.S.C. § 2510(5).

26       203.    The following instruments constitute "devices" within the meaning of the ECPA:

27           a.    The computer codes and programs Defendant and Third Parties used to track

28               Plaintiff and Class members communications while they were navigating the

Website;

b.    Plaintiff's and Class members' browsers;

c.    Plaintiff's and Class members' mobile devices;

d.    Defendant and Third Parties' web and ad servers;

e.    The plan Defendant and Third Parties carried out to effectuate the tracking and interception of Plaintiff's and Class members' communications while they were using a web browser to navigate the Website.

204.    Plaintiff and Class members' interactions with Defendant's Website are electronic communications under the ECPA.

205.    By utilizing and embedding the tracking technology provided by Third Parties on its Website, Defendant intentionally intercepted, endeavored to intercept, and/or procured another person to intercept, the electronic communications of Plaintiff and Class members in violation of 18 U.S.C. § 2511(1)(a).

206.    Specifically, Defendant intercepted—in real time—Plaintiff's and Class members' electronic communications via the tracking technology provided by Google on its Website, which tracked, stored and unlawfully disclosed Plaintiff's and Class Members' PII and PHI to Third Parties.

207.    Defendant intercepted communications that include, but are not necessarily limited to, communications to/from Plaintiff and Class members regarding PII and PHI, including their identities and information related to their personal and familial medical histories.  This confidential information is then monetized for targeted advertising purposes, among other things.

208.    By intentionally disclosing or endeavoring to disclose Plaintiff's and Class members' electronic communications to affiliates and other third parties, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(c).

209.    By intentionally using, or endeavoring to use, the contents of Plaintiff's and Class members' electronic communications, while knowing or having reason to know that the

information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(d).

210.   Defendant intentionally intercepted the contents of Plaintiff's and Class members' electronic communications for the purpose of committing a criminal or tortious act in violation of the Constitution or laws of the United States or of any state, namely, invasion of privacy, among others.

211.   The party exception in 18 U.S.C. § 2511(2)(d) does not permit a party that intercepts or causes interception to escape liability if the communication is intercepted for the purpose of committing any tortious or criminal act in violation of the Constitution or laws of the United States or of any State.  Here, as alleged above, Defendant violated a provision of the Health Insurance Portability and Accountability Act, specifically 42 U.S.C. § 1320d-6(a)(3).  This provision imposes a criminal penalty for knowingly disclosing individually identifiable health information ("IIHI") to a third party.  HIPAA defines IIHI as:

> any information, including demographic information collected from an individual, that—(A) is created or received by a health care provider ... (B) relates to the past, present, or future physical or mental health or condition of an individual, the provision of health care to an individual, or the past, present, or future payment for the provision of health care to an individual, and (i) identifies the individual; or (ii) with respect to which there is a reasonable basis to believe that the information can be used to identify the individual.[67]

212.   Plaintiff's information that Defendant disclosed to Third Parties qualifies as IIHI, and Defendant violated Plaintiff's and Class members' expectations of privacy.  Such conduct constitutes tortious and/or criminal conduct through a violation of 42 U.S.C. § 1320d-6.  Defendant used the electronic communications to increase its profit margins.  Defendant specifically used the tracking technology provided by Third Parties to track and utilize Plaintiff's and Class members' PII and PHI for financial gain.

213.   Defendant was not acting under the color of law to intercept Plaintiff's and Class members' wire or electronic communications.

---

[67] 42 U.S.C. § 1320d-6.

214.    Plaintiff and Class members did not authorize Defendant to acquire the content of their communications for purposes of invading Plaintiff's and Class members' privacy.  Plaintiff and Class members had a reasonable expectation that Defendant would not redirect their communications to Third Parties without their knowledge or consent.

215.    The foregoing acts and omission therefore constitute numerous violations of 18 U.S.C. § 2511(1), *et seq.*

216.    As a result of each and every violation thereof, on behalf of herself and the Class, Plaintiff seeks statutory damages of $10,000 or $100 per day for each violation of 18 U.S.C. § 2510, et seq. under 18 U.S.C. § 2520.

## COUNT V
**Violation of the Pennsylvania Wiretapping and Electronic Surveillance Control Act
18 Pa. Cons. Stat. § 5701, *et seq.***

217.    Plaintiff incorporates by reference the allegations contained in the paragraphs above as if fully set forth herein. Plaintiff repeats the allegations contained in the paragraphs above as if fully set forth herein and brings this count individually and on behalf of the members of the Pennsylvania Subclass against Defendant.

218.    The Pennsylvania Wiretapping and Electronic Surveillance Control Act ("WESCA") prohibits (1) the interception or procurement of another to intercept any wire, electronic, or oral communication; (2) the intentional disclosure of the contents of any wire, electronic, or oral communication that the discloser knew or should have known was obtained through the interception of a wire, electronic, or oral communication; and (3) the intentional use of the contents of any wire, electronic, or oral communication that the discloser knew or should have known was obtained through the interception of a wire, electronic, or oral communication.  18 Pa. Cons. Stat. § 5703.

219.    Any person who intercepts, discloses, or uses or procures any other person to intercept, disclose, or use, a wire, electronic, or oral communication in violation of the Act is subject to a civil action for (1) actual damages, not less than liquidated damages computed at a rate

of $100 per day for each violation or $1,000, whichever is higher; (2) punitive damages; and (3) reasonable attorneys' fees and other litigation costs incurred. 18 Pa. Cons. Stat. § 5725(a).

220.    At all relevant times, Defendant procured the Third Parties to track and intercept Plaintiff's and Pennsylvania Subclass members' internet communications while navigating the Website that Defendant owns and operates.

221.    Defendant, when procuring the Third Parties to intercept Plaintiff's communications, intended for the Third Parties to learn the meaning of the content that Website visitors requested.

222.    At all relevant times, the Third Parties intentionally used the intercepted communications for their own purposes, including to improve the Third Parties' own products and services.

223.    The wiretapping of Plaintiff and Pennsylvania Subclass Members occurred in Pennsylvania, where Plaintiff and Pennsylvania Subclass Members accessed the Website and where the Third Parties—as enabled by Defendant—routed Plaintiff's and Pennsylvania Subclass Members' electronic communications to their servers.

224.    These communications were intercepted without authorization and consent from Plaintiff and Pennsylvania Subclass Members. Plaintiff and Pennsylvania Subclass Members did not provide their prior consent to the Third Parties' intentional access, interception, reading, learning, recording, collection, and usage of Plaintiff's and Pennsylvania Subclass Members' electronic communications. Nor did Plaintiff and Pennsylvania Subclass Members provide their prior consent to Defendant's procuring the Third Parties for the foregoing.

225.    Plaintiff and Pennsylvania Subclass Members were not aware that their electronic communications were being intercepted by the Third Parties.

226.    Plaintiff and Pennsylvania Subclass Members had a justified expectation under the circumstances that their electronic communications would not be intercepted. Said electronic communications consisted of "nonpublic personal information," as defined by 16 C.F.R. § 313.3 (the Gramm-Leach-Bliley Act).

227.    Plaintiff and Pennsylvania Subclass Members have been injured by Defendant's WESCA violations, and pursuant to 18 Pa. Cons. Stat. § 5725(a), each seeks statutory damages of $1,000 for each of Defendant's violations of WESCA.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A.    For a determination that this action is a proper class action;

B.    For an order certifying the Class, naming Plaintiff as representative of the Class, and naming Plaintiff's attorneys as Class Counsel to represent the Class;

C.    For an order declaring that Defendant's conduct violated the statutes referenced herein;

D.    For an order finding in favor of Plaintiff and the Class on all counts asserted herein;

E.    For an award of compensatory damages, including statutory damages where available, to Plaintiff and the Class members against Defendant for all damages sustained as a result of Defendant's wrongdoing, in an amount to be proven at trial;

F.    For punitive damages, as warranted, in an amount to be determined at trial;

G.    For an order requiring Defendant to disgorge revenues and profits wrongfully obtained;

H.    For prejudgment interest on all amounts awarded;

I.    For injunctive relief as pleaded or as the Court may deem proper;

J.    For an order awarding Plaintiff and the Class their reasonable attorneys' fees and expenses and costs of suit; and

K.    For an order granting Plaintiff and Class members such further relief as the Court deems appropriate.

## **DEMAND FOR JURY TRIAL**

Plaintiff, on behalf of herself and the proposed Class, demands a trial by jury for all of the

claims asserted in this Complaint so triable.

Dated:  March 28, 2025                   Respectfully submitted,

                                         **BURSOR & FISHER, P.A.**

                                         By:    *L. Timothy Fisher*

                                         L. Timothy Fisher (State Bar No. 191626)
                                         Joshua R. Wilner (State Bar No. 353949)
                                         1990 N. California Blvd., 9th Floor
                                         Walnut Creek, CA  94596
                                         Telephone: (925) 300-4455
                                         Facsimile:  (925) 407-2700
                                         E-mail: ltfisher@bursor.com
                                                     jwilner@bursor.com

                                         *Attorneys for Plaintiff*